UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| FARENCO SHIPPING CO LTD | § | |
| | § | CIVIL ACTION |
| Plaintiff, | § | NO. 12-2544 |
| | § | |
| v. | § | SECTION: "A" - (2) |
| | § | |
| | § | JUDGE: JAY C. ZAINEY |
| | § | |
| FARENCO SHIPPING PTE LTD, | § | MAGISTRATE: JOSEPH C. WILKINSON, |
| JR. | | |
| OCEAN GREAT INDUSTRIAL LTD., | § | |
| TEAMZONE LTD., and LIU SONG | § | |
| | § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |
| v. | § | |
| | § | |
| | § | |
| NORTON LILLY | § | |
| agent for the vessel M/V Ocean Shanghai | § | |
| and Defendants | § | |
| Solely as Garnishee. | § | |

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO VACATE
ATTACHMENT AND/OR TO DISMISS FOR LACK OF JURISDICTION
OR ALTERNATIVELY, TO SET SECURITY**

Farenco Shipping Co. Ltd. ("**Farenco BVI**") submits this memorandum, the Declaration of

Ray Ng dated November 6, 2012 ("**Ng Declaration**"), the Declaration of John Ayres dated

November 6, 2012 ("**Ayres Declaration**"), and the Declaration of Patrick Patrick, dated November 6,

2012, ("**Patrick Declaration**") in opposition to Defendants' motion to vacate the Rule B attachment,

Defendants' premature motion to dismiss the BVI clawback claims, and in opposition to Defendants'

request that substitute security be set at $900,000.00 despite the clear and hardfast rule that substitute

security be set at the value of the vessel upon due appraisal, currently $19-20 million ("**Defendants' Motion**").

Most of the facts relevant to this matter are set forth in Farenco BVI's Verified Complaint, which is supplemented by the Ng, Ayres and Patrick Declarations submitted herewith.  Farenco BVI also respectfully refers the Court to the docket of the ongoing chapter 15 proceeding, *In Re Farenco Shipping Co. Ltd.,* 11-14138 (REG) (Bankr. S.D.N.Y.) for a full exposition of the facts that have led to this attachment, including but not limited to the substantial documentary evidence that underlies and supports Farenco BVI's allegations herein.

## Preliminary Statement

The Defendants' Motion relies upon arguments that have been expressly rejected by this district and the 5th Circuit, and ignores the reality that Defendants' wrongful acts give rise to more than one cause of action.  Namely, clawback claims under BVI law, as well as indemnity claims arising from the FFA breaches that resulted in Farenco BVI's bankruptcy.[1]

---

[1]  In fact, Defendants' conduct likely gives rise to many more causes of action, which may be asserted in these and other proceedings, including but not limited to the following:

(i) Breach of fiduciary duty against pursuant to the provisions of NY BCL § 720 (authorizing actions for breach of fiduciary duty against directors of foreign corporations) - defendant Liu Song caused debtor Farenco BVI to register with New York's Secretary of State for Authorization to do business as a foreign corporation to avoid attachments related to the very debts at issue in this case.  Defendant Liu Song also caused defendant Farenco Singapore as well as another Farenco entity not necessary to this particular action to similarly register with New York's Secretary of State.  The Bankruptcy Court for the Southern District of New York (Gerber, J.), enjoined the Farenco entities from "de-registering" *sua sponte*.  Defendant Farenco Singapore is currently arguing that the *sua sponte* injunction is unconstitutional and that registration to do business within a state does not result in personal jurisdiction.

(ii) Violation of the Racketeering Influenced and Corrupt Organizations ("RICO") statute 18 U.S.C. § 1961 *et seq*.  To wit, a combination of entities and persons in this matter engaged in a conspiracy to commit bankruptcy fraud, general fraud and theft, utilizing the protections of registration with New York's Secretary of State and the United States financial system - particular the wire and electronic transaction system of New York's intermediary banks.  The wrongful transfers alleged herein were unraveled through discovery obtained directly from New York's intermediary banks.

(iii) Additional claims include tortious interference with contracts of Farenco BVI counterparties (including but not limited to the FFA creditors at issue here); violations of the BVI Companies act and the BVI 2003 Insolvency Act; and other claims to be investigated and determined.

Farenco BVI's complaint easily states a *prima facie* maritime indemnity claim against Defendants arising from breached FFA agreements.  Numerous courts - including in this district - have ruled that FFAs are maritime contracts.  These various courts have previously rejected the precise arguments made by Defendants to the contrary before this Court.  For the most part the conclusion of the judiciary has been that notwithstanding their future qualities, FFAs are "salty" enough to invoke the court's admiralty jurisdiction and directly pertain to the provision of shipping services.  Indeed, the FFAs at issue pertain to future services over specific trade routes by specific ship types.

It is also well established that an indemnity action does not require an expressly written indemnification clause.  In the United States, this is often referred to as the doctrine of equitable indemnity.  BVI and English law similarly recognize the principles underlying this remedy. Simply, Defendants caused Farenco BVI to breach the FFA agreements in question via their breaches of the 2003 BVI Insolvency Act, and breaches of fiduciary duty, arising from the wrongful transfer of Farenco BVI's assets and cash.  These actions caused harm to Farenco BVI in the form of real and economic damages, as well as the assertion of claims against Farenco BVI.  Moreover, Defendants utilized the Approach Group structure to create a "win-win" FFA trading sham.  Under this sham Defendants and Approach Group caused Farenco BVI to enter FFA trades, including the trades at issue, upon the premise that any profits from success would be diverted out of Farenco BVI, but uncollectable and losing trades would remain with Farenco BVI, causing significant, unserviceable liabilities to Farenco BVI (and its creditors).  As such, Farenco BVI is entitled to indemnification from Defendants, whose wrongdoing caused this harm.  It is also black letter law that indemnity actions arising out of maritime contract cases fall within the Court's admiralty jurisdiction.

Next, Defendants dispute that this Court has subject matter jurisdiction to adjudicate the BVI law claims.  As an initial matter, Defendants' argument is premature because Farenco BVI has not served Non-Resident Attachment Statute Writ upon the vessel.  Farenco BVI expressly requested the

issuance of two separate writs of attachment pursuant to Rule B and the Non-Resident Attachment Statute, respectively.  Only the Rule B writ has been served and the vessel is only attached pursuant to the Rule B writ at this time.

Moreover, Defendants' argument that this court does not have subject matter jurisdiction in connection with the BVI law claims is meritless as the issue of federal courts' subject matter jurisdiction to decide foreign-law claw-back claims was squarely adjudicated by the Fifth Circuit in *Condor*[2].  Condor was cited by Plaintiff in the complaint and supporting motion.  In *Condor*, the Fifth Circuit explicitly held that district courts have subject matter jurisdiction to adjudicate foreign-law avoidance claims such as those at issue here.  Tellingly, Defendants failed to distinguish or even cite *Condor* in their Motion.  Such failure to do so should be carefully scrutinized by the court.

Defendants' contention that these claims are too complicated for this Court to adjudicate is misplaced.  The BVI law claims at issue here are no more complex than the Nevis claims at issue in *Condor*.  The BVI law issues that underpin both the indemnity and the clawback claims at issue here are really quite simple.  In the BVI, just as in the United States, the under-value and/or preferential transfer of a company's assets to connected, "insider" parties is unlawful. Such transfers can be clawed-back and remedied by the estate when discovered.

It should also be noted that the BVI Court has given explicit authorization for Farenco BVI and the Liquidator to commence this attachment action, and in this process was informed of Defendants' alleged "defenses."  Ayes Declaration Ex. 7.  As fully set forth in the accompanying Declaration of Ray Ng, the BVI Court's determination that at least $33 million was fraudulently transferred from Farenco BVI is a final decision based on the evidence that now cannot be appealed.  Indeed, the BVI Court noted at the hearing authorizing this attachment action that Liu Song, sole

---

[2] *In re Condor Insurance Ltd.*, 601 F.3d 319 (5th Cir. 2010)

4

director of Approach Group had failed to contest or otherwise appeal its decision on the fraudulent transfers.

The fact that the BVI Court's judgment that the transfers were fraudulent is final underscores both the seriousness of this case and the likelihood that Farenco BVI will prevail in demonstrating that the vessel currently under attachment is the direct fruit of those fraudulent transfers.[3] Indeed, this allegation is supported by documentary proof in the form of bank transfers characterizing $7.6 million to the Ocean Shanghai's former direct owner as "purchasing funds" for the vessel in the bank transfer "reference" column, as well as two separate payments of ~$30 million to CIDO Shipping, the parent company of the Ocean Shanghai's former owner.

Without any citation or support Defendants assert that substitute security should be set at $900,000 -- an amount they contend is equal to Ocean Great's equity in the Vessel.  However, the relevant statutory language, (Supplemental Admiralty Rule E(5)) and uniform precedent requires that substitute security equal the value of the attached asset (or claim, if lower) regardless of any mortgage be posted for release of the vessel.  Moreover, Farenco BVI has submitted a valuation by Compass Maritime Services, a respected United States-based vessel appraiser ("**Compass Appraisal**").  The Compass Appraisal values the Ocean Shanghai at between $19 - $20 million. Based on the Compass Appraisal, there is approximately $4 million  in equity held by Defendants in the Ocean Shanghai.

Defendants' arguments concerning the vessel mortgage, in addition to being invalid, also puts the cart before the horse.  The alleged "mortgage" is actually a revolving line of credit (not a purchase money mortgage) that was issued nearly a year after Defendants' purchased the Vessel for cash using the wrongfully transferred Farenco BVI funds.

---

[3] Fraudulent transfers are referred to under BVI law more commonly as "Transfers Under Value" or "TUVs"

China Merchants bank has not appeared in this action and has not alleged that any loan agreement has been breached.  Tellingly, Defendants raised the issue of mortgage subordination themselves, as they are keenly aware of the issues surrounding the relationship between China Merchants Bank and Defendants.  Moreover, there is also a significant probability that China Merchants Bank's "mortgage" does not prime Farenco BVI's claims *ab initio* because China Merchants Bank knew or had constructive knowledge that any security interest they took in the Vessel would be subject to a constructive trust under BVI law arising from the fraud at issue.

Finally, it is also highly likely that the ~$15 million Defendants allege China Merchants Bank is owed is secured by collateral other than this Vessel, including but not limited to the remaining three "Ocean" vessels owned by Defendants, Defendants' incoming charter hire, and the shares of the various vessel holding entities.  As such, China Merchants bank may never appear in this action, and will enforce its security interests via other assets of Defendants.  In the event that China Merchants Bank does take the calculated risk of asserting its security interest in this particular vessel, this Court may still direct China Merchants bank to enforce its claim against other available security pursuant to the equitable doctrine of marshaling, which has been recognized in admiralty law.  These issues all require further scrutiny and are in any event contingent on China Merchants' bank appearance in this action to enforce its security interest.  Therefore it Defendants' argument that substitute security should be set at the value of Defendants' equity in the Ocean Shanghai is invalid and improper.

## ARGUMENT

On a motion to vacate a maritime attachment, the attaching party has the burden of proving "why the arrest or attachment should not be vacated or other relief granted consistent with these rules." FED. R. CIV. P. Supplemental Rule E(4)(f). Thus, the attaching party must present sufficient evidence to show probable cause for the attachment. *See Continental Ins. Co. v. Adriatic Tankers Shipping Co.,* No. 95-3564, 95-3571, 1995 WL 649942,[*]1 (E.D.La. Nov. 2, 1995). When considering

a motion to vacate, the Court need not definitively resolve the dispute between the parties, but instead it must only determine whether there are reasonable grounds for issuing the order. *See Cashman Equipment Corp. v. Trans Caribbean Trans. Co., Ltd.,* No. 96-3116, 1996 WL 626294, [*]2 (E.D.La. Oct. 29, 1996).  As discussed below, the burden to be met by a plaintiff in seeking to maintain an attachment is a "minimal" one and is "easily met."[4]  *Anchor Marine Transp. Ltd. v. LONESTAR 203*, No. 6:08-1593, 2009 WL 783395, *1 (W.D.La. Mar. 18, 2009).

Courts frequently characterize the "reasonable grounds" burden as a requirement to make a *prima facie* showing that plaintiff is entitled to the damages sought and secured by the arrest or attachment.[5]  Courts inquiring further merely review the limited evidence present – taking into account the lack of discovery and preliminary nature of a Rule E(4)(f) hearing – and determine whether plaintiff **_may_ be able to prove its contentions**. *North of England Protection & Indem. Ass'n v. M/V NARA*, No. 99-0464, 1999 WL 33116416, *2 (E.D.La. Feb. 26, 1999).[6]

The following must be demonstrated to meet Farenco BVI's burden: "(1) the plaintiff has a valid *prima facie* admiralty claim against the defendant; (2) the defendant cannot be found within the district; (3) the defendant's property may be found within the district; and (4) there is no statutory or maritime law bar to the attachment."[7]

---

[4] "The showing required by Rule B(1) for the initial order of attachment is **_minimal_**[.]"  *Anchor Marine Transp. Ltd. v. LONESTAR 203*, No. 6:08-1593, 2009 WL 783395, *1 (W.D.La. Mar. 18, 2009); *accord Naftomar Shipping & Trading Co. v. KMA Int'l, S.A.,* No. V-11-2, 2011 WL 888951, *2 (S.D.Tex. Mar. 10, 2011) (citations omitted)).

[5] *See also*, *Parkroad Corp. v. China Worldwide Shipping Co.*, No. 05 Civ. 5085, 2005 U.S. Dist. LEXIS 11122, *3 (S.D.N.Y. June 6, 2005); *see also Blake Maritime, Inc. v. Petrom S.A.*, No. 05 Civ. 8033, 2005 U.S. Dist. LEXIS 26310, *12 (S.D.N.Y. Oct. 31, 2005); *Caspar Marine, Inc. v. Seatrans Shipping Corp.*, 969 F.Supp. 395, 396 (E.D. La. 1997).

[6] *Ullises Shipping Corp. v. FAL Shipping Co. Ltd.,* 415 F.Supp.2d 318, 322-23; *Linea Naviera de Cabotaje v. Mar Caribe de Navegacion, C.A.*, 169 F.Supp.2d 1341, 1359-60; *A. Coker & Co. v. Nat'l Shipping Agency Corp.*, No. CIV. A. 99-1440, 1999 WL 311941, at *2 (E.D. La. May 17, 1999); *see also Maersk, Inc. v. Neewra, Inc.*, 443 F.Supp.2d 519, 530-31.

[7] *See also Naftomar Shipping & Trading Co. v. KMA Int'l, S.A.*, No. V-11-2, 2011 WL 888951, at *2 (S.D.Tex. Mar. 10, 2011)(quoting *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty. Ltd.*, 460 F.3d 434, 439 (2d Cir. 2006), *abrogated on other grounds by Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58 (2d Cir. 2009).

Here, elements 2-4 are not in dispute, and as set forth below and in the verified complaint, Farenco BVI has stated a valid admiralty cause of action in indemnity against Defendants.

It has been established by numerous courts as well as this district that the contracts underlying this dispute, freight forward agreements ("FFAs") are maritime contracts and United States, BVI and British law all recognize implied indemnity arising from the breaches of those contracts under the circumstances.

Moreover, the facts of this case perfectly accord with the recognized purposes underlying Rule B attachments, as the following excerpts demonstrate[8]:

> Particularly in light of the ***unique corporate arrangements that exist in the maritime industry*** and the need for uniformity of maritime laws, the federal maritime law has adopted rules governing corporate liability, irrespective of whether corporate entities expected, *ex ante*, that their corporate relationship would be scrutinized in the context of a maritime action.[9]

> In a world of ***shifting assets***, numerous ***thinly-capitalized subsidiaries***, flags of convenience and flows of currencies, ***maritime attachments have particular importance***.[10]

> Taken together, the Complaint and Plaintiffs' extrinsic allegations describe an international web of ***suspect corporations*** and individual actors who employ ***tacit alliances and shifting identities*** as the primary tools of their malfeasance. In a case such as this, the Court will not permit [the party seeking vacatur] to employ those

---

[8] *Polar Shipping Ltd. v. Oriental Shipping Corp.*, 680 F.2d 627, 637 (9th Cir. 1982)("Maritime law deals primarily with ships that sail the seven seas. A ship may be here today and gone tomorrow, not to return for an indefinite period, perhaps never. Assets of its owner, including debts for freights, as in this case, within the jurisdiction today, may be transferred elsewhere or paid off tomorrow. It is for these reasons that maritime actions *in rem*, libeling a ship or other assets of a defendant, Supplemental Rule C, or attachment in actions *in personam*, Supplemental Rule B, were developed. These reasons are as valid today as they ever were... A ship can quietly slip its moorings and depart the jurisdiction. It can easily take with it such tangible property as may be within the jurisdiction. And credits can be quickly transferred elsewhere").

[9] *In re M/V RICKMERS GENOA Litigation*, 643 F.Supp.2d 553, 557 (S.D.N.Y. 2009)(multiple citations omitted)(emphasis added).

[10] *Navalmar (U.K.) Ltd. v. Welspun Gujarat Stahl Rohren Ltd.,* 485 F.Supp.2d 399, 404 (S.D.N.Y. 2007)(citing *Aurora Maritime Co. v. Abdullah Mohamed Fahem & Co.,* 85 F.3d 44 (2d Cir. 1996))(emphasis added).

same tools to escape the attachment presently in dispute.[11]

Accordingly, admiralty courts have continued to follow the rule that a plaintiff has a light burden to maintain a Rule B attachment, and that this light burden results in the ability for a plaintiff to "quite easily obtain" security "with a minimum of litigation":

> This policy has been implemented by a _**relatively broad maritime attachment rule**_, under which the attachment _**is quite easily obtained**_. . . .

> To be sure, such a hard-and-fast rule may occasionally sweep too broadly. We think, however, that Congress chose a determinate rule rather than a flexible standard _**to ensure that attachments may be obtained with a minimum of litigation**_. . . .[12]

In the _Cashman_ and _Satra Metallurgical_ cases,[13] this Court sustained Rule B attachments over a Rule E(4)(f) challenge based upon far less substantial allegations than Farenco BVI has set forth here.

In _Cashman_, the Court considered sufficient the "cryptic allegations concerning Texel's [alleged joint venture defendant] status as a joint venture involved in the bareboat charter." _Id._  The district court ruled so because it was "not convinced at this stage that plaintiff completely fails to state a claim against Texel, or that, on the limited evidence and argument advanced, plaintiff's claims are meritless. Therefore I do not find the issuance of the attachment and garnishment order unreasonable." _Id._  In _Satra_ the Court similarly sustained an attachment based upon a "joint venture" theory, holding "[w]hile plaintiff has submitted few specific facts to suggest that the three defendants were actually engaged in a joint venture, it did submit significant evidence to suggest that defendants have the same business address and other business connections with each other, thus, raising the possibility that they formed a joint venture.  Likewise, Cester's

---

[11] _Maersk_, 443 F.Supp.2d at 530-31 (emphasis added).
[12] _Aqua Stoli,_ 460 F.3d at 443-44 (internal citations omitted) (emphasis added).
[13] _Cashman Equip. Corp. v. Trans Caribbean Transp. Co_, Civ. A. No. 96-3116, 1996 WL 626294, *3 (E.D.La. Oct. 29, 1996); _Satra Metallurgical, Inc. v. Delmar Int'l, S.A._, Civ. A. No. 94-3282, 1994 WL 577433, *2 (E.D.La. Oct. 18, 1994).

submissions, while demonstrating that there are questions as to its liability on a joint venture theory, have not shown the claim to be clearly meritless."[14]

In this case, by contrast, a critical prong of both the BVI law clawback and indemnity claims has <u>already</u> been (finally) decided by the BVI Court:  the cash transfers out of Farenco BVI to Approach Group were TUVs and fraudulent.  This fact forms a solid foundation for both the indemnity claims (as Defendants are the causes of the FFA breaches, Farenco BVI insolvency and the instant clawback claims), as well as the clawback claims against the fruits of the fraudulent transfers, including but not limited to the attached vessel Ocean Shanghai.

### POINT I: A MARITIME INDEMNITY CLAIM HAS BEEN STATED

*A. The FFAs Are Maritime Contracts*

More than a dozen federal judges have either issued or upheld Rule B attachment orders in connection with disputes arising under FFA agreements on the basis that FFA Agreements are maritime contracts. [15]

Farenco BVI also refers to the memorandum submitted in support of its request for issuance of the Rule B attachment, and in particular, its discussion of *Bulk Trading S.A. v. Capex Europe*

---

[14] *Satra Metallurgical,* 1994 WL 577433, at *2

[15] *Flame SA v. Primera Maritime (Hellas) Ltd.*, No. 09-8138, 2010 WL 481075 at *2 (S.D.N.Y. Jan. 28, 2010) (Duffy, J.) (FFAs are maritime contracts); *Armada Singapore Pte Ltd. v. North China Shipping Co. Ltd.,* No. 09-5069, 2010 WL 481061 (S.D.N.Y. Jan. 14 2010) (same); *Armada (Singapore) Pte Ltd. v. N. China Shipping co. Ltd.,* 633 F.Supp.2d 168, 169 (S.D.N.Y. 2009); *Flame v. M/V Lynx,* No. 10-0278 (E.D.Tex. June 22, 2010).

In *Brave Bulk Transport Ltd. v. Spot on Shipping Ltd.*, No. 07-4546, 2007 WL 3255823 *2 (S.D.N.Y. Oct. 30, 2007) (holding FFAs are maritime contracts), the court noted that in nine other cases different judges in the Southern District of New York had agreed to writs of attachment on FFA claims: *C. Transport Panamax Ltd. v. North America Steamships Ltd.,* a.k.a. N.A.S.L., 06 CV 13178(RLC); *Daeyang Shipping Co. Ltd. v. Navitrans Maritime Inc.,* 04 CV 08050(VM); *Deiulemar v. Source Link Shipping Co. Ltd.,* 07 CV 02983(SAS); *Deiulemar v. Spot On Shipping Ltd., et. al.,* 07 CV 03820(VM); *Eurotrade Inc., Liberia v. Source Link Shipping Co. Ltd., BVI,* 07 CV 3172(SAS); *Pan Oceanic Maritime Inc. v. Source Link Shipping Co. Ltd.,* 07 CV 03089(CM); *Perseveranza Di Navigazione S.P.A. v. Source Link Shipping Co. Ltd.,* 07 CV 03091(RPP); *Taiwan Maritime Transport Co. Ltd. v. Navitrans Maritime Inc. and Navigation Maritime Inc.,* 06 CV 13564(RJH), and *Setsea S.P.A. v. Source Link Shipping Co. Ltd.,* 07 CV 6230(DAB).  Since 2007, many other judges  have issued and upheld similar Rule B attachments predicated on FFAs.

*S.A.M.*, No. 10-297, 2011 WL 1088762 (E.D.La March 22, 2011), a comprehensive opinion finding admiralty jurisdiction for FFA claims recently issued in this district.

Defendants' arguments that the FFAs underlying this indemnity action are not maritime contracts should be rejected, as they are the precise argument that the defendants raised in *Bulk Trading S.A.*, and which the *Bulk Trading* Court rejected. *See* Doc. 26-1 (Capex argued that security should be vacated on the grounds that FFAs are not maritime contracts because they are "nothing but a financial hedge," and therefore the court lacks admiralty jurisdiction).

Virtually identical arguments as defendants make here were also presented by defendants to Judge Clark of the Eastern District of Texas in the case of *Flame S.A. v. M/V Lynx* ("**Lynx**"), attached to the Patrick Declaration as Exhibit 3). The *Lynx* Court similarly engaged in a thorough analysis of whether FFAs are maritime contracts and ruled that they were.

In both *Capex* and *Lynx*, as here, defendants argued that FFAs did not fall within Admiralty jurisdiction under English law. That argument was deemed to be misleading in both cases. Both the *Capex* and *Lynx* courts noted the important distinction between causes of actions that give rise to maritime liens against specific vessels, and causes of action that simply give rise to maritime jurisdiction. This distinction exists both under English and United States law. The *Lynx* court rejected defendant's unsubstantiated claim that FFAs would not fall within the maritime jurisdiction of English Court. *Lynx* at 6-7. In *Capex*, plaintiff's English law expert explained how even if a claim is a maritime claim, it may be brought in a commercial court of England. Doc. # 37-2 (Declaration of Timothy James Houghton). Indeed the distinction in English law between maritime claims sufficient to invoke admiralty jurisdiction, and maritime *lien* claims exists in United States law. Hence, there are lien claims against vessels that may be asserted via Rule C, whereas United States maritime law authorizes any plaintiff with a maritime claim to obtain security for that claim via Rule B.

Ultimately, in *Bulk Trading* and *Lynx*, Judges Africk and Clark, respectively, rejected all of the arguments that Defendants attempt to make before this Court now (Doc. #45, March 22, 2011).[16]

The straightforward explanation for these decisions is that the business of FFAs, which business primarily involves and is between chartering entities and vessel owners (*see Lynx* at 6) is "salty" enough to satisfy the "conceptual approach" to maritime contract jurisdiction dictated by the Supreme Court in *Norfolk Southern Railway Co v. Kirby*, 543 U.S. 14 (2004)(famously, "a maritime case about a train wreck").

*Norfolk Southern Railway Co v. Kirby*, 543 U.S. 14 (2004) stands for the "conceptual approach" towards maritime contracts, and instructs that one need only look for a "reference to maritime service or maritime transaction" in order to find a "principal objective" of the contract that is maritime. *Id.* at 24-5. *Kirby* substantially supports Farenco BVI's position. The rationale that FFAs are commitments to perform maritime services in the future is accurate because the obligations are sufficiently connected to maritime commerce such that they constitute a "maritime service." Hence, Defendants' "hail mary" argument - that all of the courts to have examined the issue have it wrong -- should not be followed.

Consider, for example, the close connection between Farenco BVI's former "intermediate chartering" business and its former FFA business.  Before Defendants engaged in the wrongful transfers and purchased the disputed vessels with those transfers, Farenco BVI's business was strictly "paper."  In addition to FFA trading, Farenco BVI would time charter vessels from other time charterers, and then sub-charter those vessels to other charterers, creating "charter chains."  Farenco BVI did not "operate" or "manage" the vessels, rather it was simply making bets about what the cost of charter hire would be in the future.  It is undeniable that such intermediate chartering business falls

---

[16] For the Court's reference, the law firm of Holland & Knight LLP was of counsel in *Bulk Trading* and the undersigned are familiar with the arguments made therein.

within the Court's admiralty jurisdiction.  FFA agreements are not so fundamentally different from intermediate chartering as to warrant a different result.

Where specific trade routes and vessel types are specified, these are such references that suggest the maritime nature and character of the contracts.  *Brave Bulk Transport Ltd. v. Spot On Shipping Ltd.*, 2007 WL 3255823 at *3 (S.D.N.Y. Oct. 30, 2007) (where the court looked beyond the terms of the FFA contract, the court based its reasoning on the fact that "the contract specified the type of vessel to be used" and "the routes upon which said vessels would travel"); *see also Flame S.A. v. Primera Maritime (Hellas) Ltd.*, 2010 WL 481075 at *2 (S.D.N.Y. Feb. 5, 2010) ("FFAs seek to minimize the risk of fluctuating ocean freight rates for *specific* groups of vessels traveling *identified and agreed to* ocean routes (emphasis added)); *Wilhelmsen Premier Marine Fuels AS v. UBS Provedores Pty Ltd.*, 591 F.Supp.2d 399 (S.D.N.Y. 2007) (holding that the provision of marine fuel oil to *designated vessels* was within admiralty jurisdiction).  FFAs need not make reference to a specific voyage, vessel, or cargo as the Defendants contend.  *See Proshipline Inc. v. Aspen Infrastructures Ltd.*, 609 F.3d 960, 967 (9th Cir. 2010).

*Alphamate Commity GMBH v. CHS Europe* SA, 627 F.3d 183 (5th Cir. 2010), cited by Defendants, is inapposite to this matter.[17]  There, this court dealt with a mixed sales contract with a maritime component.  The agreement involved sale of grain.  Simply because the grain was to be transported by sea was not enough to make the contact maritime as the transportation element not the primary purpose of the contract.  Moreover, the breach of the contract was for the breach of the obligation to purchase the grain, a claim was severable from the demurrage and detention claims

---

[17] Defendants also cite *Folksamerica Reinsurance Co. v. Clean Water of N.Y., Inc.*, 413 F.3d 307 (2d Cir. 2005) for the proposition that derivative agreements are not maritime contracts because they relate to ships.  But in *Folksamerica*, the court found that an insurance policy was a maritime contract.  Even though the policy excluded certain traditional marine risks such as protection and indemnity coverage, the court found that the primary objective was to cover maritime risks, and thus the court had admiralty jurisdiction.  413 F.3d at 323.  Moreover, the FFAs are not "derivative" as Defendants state but are rather principally maritime.

related to that breach.  "[I]f a contract's maritime obligations are separable from its non-maritime aspects and can be tried separately without prejudice to the other, admiralty jurisdiction will support trial of the maritime obligations"  *Id.* at 187.  By contrast, the FFA contracts are wholly maritime, contracts that are "commitments to perform maritime services in the future."  *Eitzen Bulk A/S v. Capex Indus., Ltd.*, No. 10-395, 2010 U.S. Dist. LEXIS 136362, *4-5 (E.D.La Dec. 13, 2010).  There is no contractual obligation in FFA agreements that are severable from the maritime elements.

**B.  US, BVI and English Law Recognize the Principles Underlying What United States Courts Call Equitable Indemnity, and the Doctrine Applies Here**

The doctrine of equitable indemnity is firmly rooted in the common law of the United States, of the various states, in maritime law, as well as English and British and Virgin Islands law.  *See, e.g. Iowa Fleeting Serv. Inc. v. Watson Marine Serv., Inc.,* No. 87-0655, 1988 WL 92020 (E.D.La Aug. 24, 1988)(denying summary judgment with respect to equitable indemnity claim against marine surveyor); *Bourg v. Chevron USA et al.,* 91 F.3d 141 (5th Cir. 1996)(describing principle of equitable indemnity examining requirement that indemnitor be given adequate protection with respect to settlement); *Minyard v. Curtis Products, Inc.,* 251 La. 624, 650 (La. 1968)(An indemnity claim is a quasi-contractual obligation based on the equitable principle that "where there is an unjust enrichment of one at the expense or impoverishment of another, then the value of that enrichment or else, in some cases, the amount of the impoverishment must be restituted.")  Ng Declaration ¶¶ 38-48 (describing BVI and English law indemnity principles highly analogous to those of the United States).   Defendants' counsel appear to be unfamiliar with such causes of action or have simply ignored the vitality of the doctrine in U.S., BVI and English jurisprudence.

Farenco BVI has directly incurred significant liabilities and harms as a result of Defendants' wrongful act of fraudulently and/or preferentially diverting the business, cash and assets of Farenco BVI causing the breach of the FFA at issue here, the subsequent liquidation and an estate with $69 million in debt claims solely arising from FFA liabilities - there are no Farenco BVI creditors other

than these.  V. Compl. at ¶ 107; *Ng* Declaration ¶¶ 38-47.  The fact that Farenco BVI has incurred the liabilities and resulting damages from the breached FFAs is what is relevant, not that Farenco BVI has been prevented from disbursing funds to its creditors due to Defendants' wrongful transfers. *In re Complaint of Murmansk Shipping Co.,* No. 00-2354, 2001 WL 699530 at *4 (E.D.La. June 18, 2001) (upholding an attachment for indemnity claims because plaintiff had already been sued on the potentially indemnity-triggering liability).[18]

Liu Song foresaw the crash in the shipping market and realized that Farenco BVI would incur significant debts to its two FFA creditors, and further became aware that other Farenco BVI counterparties would default on their FFAs. V. Compl. at ¶ 22; Ayres Declaration ¶ 13.  As such, Liu Song began the transfer of Farenco BVI's "physical business" to the newly created entity Farenco Singapore, and fraudulently and/or preferentially transferred nearly $70 million in cash as well as profitable FFAs to Approach Group.  *Id.* at ¶ 32-34; Ayres Declaration ¶13.  On this basis, Defendants utilized the Approach Group structure to directly defraud Farenco BVI's two significant FFA creditors, creating a "heads I win, tails you lose" situation where successful business would be funneled to his other entities, while liabilities and uncollectible remain with Farenco BVI.  *Id.* at ¶ 41; *Id*.  The result, in Liu Song's own words, was that Farenco BVI was transformed in to a "shell company." *Id.* at ¶ 34.

As noted in the Ng and Ayres Declarations it is also highly significant that Farenco BVI's sole creditors, and victims of the fraudulent and/or preferential transfers, are its two "losing" FFA

---

[18] *Daeshin Shipping Co v. Meridian Bulk Carriers, Ltd.*, No. 05-7173, 2005 WL 2446236 (S.D.N.Y. 2005), where there was correspondence indicating that PanOcean appeared to be asserting claims against plaintiff, for physical damages to the vessel, it was not unduly speculative to assume that the physical damage claims were being asserted down the chain of charter parties and that plaintiff had a reasonable belief that it faced potential liability.  In *Staronset Shipping Ltd. v. North Star Nav. Inc.*, 659 F.Supp. 189 (S.D.N.Y. 1987), although the court did not elaborate on its reasoning, it found that a shipowner's indemnification claim asserted against charterer in proceeding to attach charterer's assets as security to avoid possibility of ultimate liability on stevedore's claims for fees for removing cargo from ship was not premature, even though shipowner had not yet incurred actual liability for the fees. "In the exercise of our discretion, we believe that the ship owner's concerns are reasonable and that he is entitled to the security which he seeks.")

creditors.  Ng Declaration ¶ 45; Ayres Declaration ¶ 13.  Whatever the relationship is or was between Farenco BVI and Approach Group, it is of great consequence that Defendants allege that Farenco BVI conducted its FFA trading on behalf of Approach Group as undisclosed principal.  As such, there is also an independently sufficient relationship between Farenco BVI, Approach Group (and Defendants who are alter-egos of Approach Group) such that Farenco BVI has a clear and strong right of indemnity from Defendants arising from the two FFA agreements at issue.  Ng Declaration ¶ 39-43; *See, e.g., In re Parker,* 471 B.R. 570 (9th Cir. 2012)(describing, in great detail, circumstance where debtor mortgage broker accused of breach of mortgage contract had cause of action in equitable indemnity against mortgage recipient who had obtained mortgage fraudulently, and ultimately holding that the mere fact that broker had obtained default judgment in equitable indemnity did not necessarily result in broker's underlying liability).

Defendants do not dispute that there is admiralty jurisdiction over claims for contribution and indemnity if jurisdiction exists over underlying cause of action.  *Hale v. Co-Mar Offshore Corp.*, 588 F.Supp 1212 (W.D.La 1984); *Lowe v. Ingalls Shipping*, 723 F.2d 1173, 1215 (5th Cir. 1984); *Lyons v. Pool Co. of Texas*, 781 So.2d 569 (La. Ct. App. 2000) (because the maintenance and cure claims against employer were governed by federal maritime law, federal law had to apply to all claims for subrogation and indemnity asserted by drilling contractor(citing *Rodrigue v. LeGros*, 563 So.2d 248, 251 (La. 1990)); Francis J. Gorman, *Indemnity and Contribution Under Maritime Law*, 55 Tul. L. Rev 1165 (1981) "There is admiralty jurisdiction over claims for contribution and indemnity if jurisdiction exists over the underlying cause of action. If there is admiralty jurisdiction, the substantive and legal rights of the parties are determined by federal maritime law, not state law." *Id. quoting* Schoenbaum at § 5-18, p. 215 (2d ed. 1994).[19]

---

[19] *See also Fontenot v. Chevron, U.S.A., Inc.*, 676 So.2d 557, 568 (La. 1996)*;Rebstock v. Sonat Offshore Drilling, Inc.*, No. 90-3902, 1992 WL 125360 (E.D.La 1992)(third party indemnity claims involving maritime insurance

Moreover, courts have found admiralty jurisdiction for offensive claims arising from breaches of maritime contracts, even where those claims were direct in indemnity.  *Carroll v. Protection Maritime Insurance Co., Ltd.*, 512 F.2d 4 (1st Cir. 1975)(claim against protection and indemnity insurers claiming intentional interference with plaintiff's maritime employment was so interwoven with a maritime contractual relationship as to fall within admiralty jurisdiction); *Orient Mid-East Lives, Inc. v. Albert E. Bowen, Inc.*, 255 F.Supp. 627 (S.D.N.Y. 1966)(where court held that inducement of a breach of maritime contract was a maritime tort).

## C.  *Farenco BVI Has Stated Alter Ego Claims Against Defendants*

Defendants all but concede that Farenco BVI has sufficiently stated a veil-piercing claim under the well-established principles of maritime law.  The Court is respectfully referred to Farenco BVI's verified complaint and supporting memorandum in this regard.

Defendants seem to make the argument that the remedy of piercing the corporate veil is not available if the alter-ego defendants were formed later in time.  This is a gross misstatement of the law and makes little sense.[20]  As an initial matter, the various Defendants Farenco BVI and Approach

---

contracts within the court's maritime jurisdiction (citing *Motors Insurance Co. v. Bud's Boat Rental, Inc.*, 917 F.2d 199, 203 (5th Cir. 1990)).

[20] The case that Defendants rely on for this proposition simply does not say what they claim.  In *Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684, 689 n.4 (1950), the court states that "*apart from any transfer of assets*" by the first corporation to a second corporation organized by directors, officers, and stockholders of the first corporation, the second corporation could not be held personally liable on any alter ego theory for *loss of cargo* carried in first corporation's vessel which sank, before second corporation came into existence.  The court continues, however, "It is important to note, however, that the relationship between the two respondent companies has an obvious relevance to the issue of fraudulent transfer."  *Id.*  Defendants cite no case where a later-formed company is exonerated from a fraud which is perpetrated by a related entity and from which it benefits.  The rationale of *Swift* simply does not extend to such a context, and is the very reason that veil-piercing theories are applied to later-formed affiliate companies.

There are plethora of maritime cases piercing the corporate veil amongst companies that were not created simultaneously.  *See, e.g., Northern Tankers (Cyprus) Ltd. v. Backstrom*, 967 F. Supp. 1391, 1402-09 (D. Conn. 1997); *Talen's Landing, Inc. v. M/V Venture, II*, 656 F.2d 1157 (5th Cir. 1981); *Sabine Towing & Transp. Co. v. Merit Ventures, Inc.*, 575 F. Supp. 1442 (E.D. Tex. 1983); *Naftomar Shipping & Trading Co. v. KMA Int'l, S.A.*, No. V-11-2, 2011 WL 888951, *2 (S.D.Tex. Mar. 10, 2011); *Wajilam Exports (Singapore) Pte Ltd. v. ATL Shipping Ltd.*, 475 F.Supp.2d 275, 278 (S.D.N.Y. 2006); *A. Coker & Co. v. Nat'l Shipping Agency*, No. 99-1440, 1999 WL 311941 (E.D.La. May 17, 1999); *Fesco Ocean Mgmt v. High Seas Shipping,* No. 06 Civ. 1055, 2007 WL 766115, *2 (S.D.N.Y. Mar. 12, 2007).

Group all coexisted for years.  Under Defendant's argument, it would be impossible to pierce the corporate veil as between two entities unless they were created on the same day.  Indeed, numerous reported maritime alter-ego cases directly contradict Defendants' argument.

## POINT II: THIS COURT HAS SUBJECT MATTER JURISDICTION TO ADJUDICATE THE BVI LAW CLAWBACK CLAIMS

Farenco BVI has not attached the vessel Ocean Shanghai pursuant to the Non-Resident Attachment Statute writ and hence Defendants' arguments that this Court does not have subject matter jurisdiction to decide the BVI law claims is premature.  *See Vivian Tankships Corp. v. State of Louisiana,* 254 F.3d 1080 (5th Cir. 2001)(where Non-Resident Attachment Statute order remained outstanding, had not been served, and defendant has already posted security, claim alleging unconstitutionality of the Non Resident Attachment Statute moot).  Farenco BVI explicitly requested the issuance of two writs of attachment and served only the Rule B writ upon the vessel Ocean Shanghai.  Further express instructions were provided to the United States marshal solely to seize the vessel pursuant to the Rule B writ.  Patrick Declaration Exhibit 1.

To the extent that Defendants have moved for an "expedited" motion to dismiss the claims underlying the request for the Non-Resident Attachment, that motion should be denied at this time. The Fifth Circuit has expressly held that the federal courts have the authority and subject matter jurisdiction to adjudicate foreign law insolvency claims under the auspices of chapter 15 of title 11 of the United States Code 11 U.S.C. 1501 *et seq.* ("Chapter 15").

### A.  *The Fifth Circuit Has Conclusively Resolved this Issue*

In the case of *In Re Condor Ins. Ltd.,* 601 F.3d 319 (5th Cir. 2010), the Fifth Circuit directly examined the subject matter jurisdiction of federal courts to adjudicate foreign law avoidance claims. In that case, the foreign estate brought an adversary proceeding predicated upon Nevis law-based

clawback claims against an alleged wrongful transferee.  The Fifth Circuit reversed the bankruptcy and district court's dismissal of the action for lack of subject matter jurisdiction, holding that simply because Chapter 15 limits a foreign debtors' ability to assert avoidance claims under certain provisions of the United States Bankruptcy code, foreign debtors may still pursue such claims based upon foreign law in United States courts.  *Id.*

The *Condor* Court began its analysis by recognizing that pursuant to 28 U.S.C. § 1334, the district courts have original and/or exclusive jurisdiction of all cases under, arising in or related to cases under title 11 [of the United States Code] (the "Bankruptcy Code").[21]  *Condor* at 321.

On this basis, the *Condor* Court framed the issue as follows: "[t]here is no question that the bankruptcy court has jurisdiction to recognize the Nevis proceeding as a foreign main proceeding.  Our question is whether the exceptions listed in section 1521(a)(7) to the relief available in the ancillary proceeding exclude not only avoidance actions under U.S. law but also exclude reliance upon domestic law of the foreign main proceeding." *Id.* at 321.

After engaging in an in-depth analysis of the statutory language and legislative history of Chapter 15, the Fifth Circuit concluded that the federal courts do have subject matter jurisdiction to decide the very claims at issue here:

_____

[21] As a matter of practice, district courts automatically refer such cases to the Bankruptcy Courts in the district, subject to the parties' or courts' right to "withdraw the reference."  The District Courts' subject matter jurisdiction is thus not merely extensive with, but also greater than the Bankruptcy Courts' subject matter jurisdiction.  Until recently, under these circumstances, Farenco BVI would have brought its claims as an adversary proceeding in the Bankruptcy Court for the Eastern District of Louisiana, as did the plaintiffs in *Condor*.  However, on June 23, 2011, the United States Supreme Court decided the case of *Stern v. Marshall*, 131 S.Ct. 2594 (2011).  The full impact of that decision is still being determined by the District and Bankruptcy Courts.  However, the basic holding was that there are limits on a Bankruptcy Court's "authority" (not subject matter jurisdiction) to issue final decisions with respect to certain adversarial claims arising in and related to a bankruptcy.  Rather, Bankruptcy Courts under certain circumstances are limited to making a "report and recommendation," to the District Court, akin to the position of a magistrate judge in the District Court.  So as to avoid any possibility or argument that the Bankruptcy Court for the Eastern District of Louisiana does not have "final authority" to decide the claims at issue here, the decision was made by Plaintiff to file in this Court in the first instance.  As 28 U.S.C. § 1334 makes clear, this Court certainly has "original" if not "exclusive" jurisdiction.

Congress did not intend to restrict the powers of the U.S. court to apply the law of the country where the main proceeding pends. Refusing to do so would lend a measure of protection to debtors to hide assets in the United States out of the reach of the foreign jurisdiction, forcing foreign representatives to initiate much more expansive proceedings to recover assets fraudulently conveyed, the scenario Chapter 15 was designed to prevent…. [a]s Chapter 15 was intended to facilitate cooperation between U.S. courts and foreign bankruptcy proceedings, we read section 1521(a)(7) in that light and hold that a court has authority to permit relief under foreign avoidance law under the section. We reverse the judgment of the district court dismissing for want of jurisdiction and remand for further proceedings consistent with this opinion.

*Id.* at 327.

**B.  Farenco BVI has Submitted or Referenced Compelling Evidence That Supports Farenco BVI's Allegations Concerning the "Migration" Claims, the Fraudulent/Preferential Transfer Claims, and that the Vessel Ocean Shanghai Is The Direct Fruit of The Wrongful Transfers.**

Defendants make broad statements to the effect that Farenco BVI has not produced any evidence of the "migration," that Farenco is unlikely to succeed on the merits of its transfer claims, and that there is "no relationship" between the transfers, the attached vessel and Ocean Great. Defendants have simply chosen to ignore the mountain of actual evidence rather than attempt to adequately respond.

First, as Defendants are well aware, a powerpoint presentation authored by defendants, produced in response to a subpoena by their former United States counsel, Blank Rome LLP, describes the planned migration of assets, personnel and general business from Farenco BVI to Farenco Singapore.  V. Compl. at ¶ 59; *See* Ayres Declaration Ex. 6.[22]  This is nothing less than an admission regarding the migration.  Whether or not Defendants knew at the time that such migration would be unlawful is irrelevant.

Second, Defendants' objections concerning the Investment Management Agreement and "good faith" defenses are irrelevant here.[23]  As explained in detail in the Ng Declaration ¶¶ 7- 19, the

---

[22]  This exhibit has been previously submitted in the New York Bankruptcy action, which pleadings and filings Farenco BVI incorporated by reference in its complaint.

BVI Court has already made a final and conclusive determination that the transfers from Farenco BVI to Liu Song owned Approach Group were TUVs and fraudulent.  Thus regardless of whether or not the Investment Management Agreement is truly valid and not merely a sham, as is equally likely, the Liquidator is entitled to clawback all amounts Liu Song transferred from Farenco BVI to Approach.  Defendants were properly served in the BVI Court proceedings and, to this day, have never interposed the defenses they belatedly ask this Court to consider.  In connection with Farenco BVI's application to the BVI Court to effect this attachment action, the BVI Court expressly noted that all opportunities for overturning or appealing the Court's final judgment had passed, without an appearance by any of the Defendants.  Even if the BVI Judgment were not final, the Ng Declaration, as well as Mr. Ng's previous declarations submitted in the related New York Bankruptcy action wholly undermine any notion that Defendants have a *prima facie* defense.

Third, as expressly set forth in the Verified Complaint, there is an absolute and direct connection between the vessel Ocean Shanghai, its owner Ocean Great, and the fraudulent Farenco BVI transfers to Approach Group.  Namely, Approach Group directly utilized these funds to purchase the vessel Ocean Shanghai for Defendants' benefit.  *V. Compl.* at ¶¶ 49-57; Ayres Declaration ¶¶ 4-8 & Exhs. 3-4.

The Ocean Shanghai was previously named the M/V Fortune Ocean and was owned by a Panamanian single-purpose entity called White Bellflower Shipping S.A. (**"White Bellflower"**), which was in turn owned by the parent CIDO Shipping.  V. Compl. at ¶ 51.; Ayres Declaration Exhibit 2.  On or about December 9, 2009, Approach Group made a $7.42 million payment to White Bellflower with the reference "OBI - Purchasing Fund for M/V Fortune Ocean…").  *Id.* at ¶ 52.  The

---

[23] While Farenco BVI believes there has been a clear showing of "probability of success on the merits," that is not the standard under either maritime law or pursuant to the Non-Resident Attachment statute.  Defendants merely cite a New York case in support of this proposition, but unlike Rule B or the Non Resident Attachment Statute, New York's state-law attachment expressly requires a showing of probability of success on the merits.  *See* New York Civil Practice Law and Rules §6223.

evidence of this transaction supplied by New York's intermediary banks is attached as Exhibit 3 to the Ayres Declaration.

After this payment, the Fortune Ocean was renamed Ocean Shanghai, and its registered owner was changed from White Bellflower to Defendant Ocean Great. *Id.* at ¶ 53; Ayres Declaration ¶ 9.

Ocean Great was incorporated in Hong Kong on November 19, 2009.  V. Compl. at ¶ 54; Ayres Declaration ¶ 10.  Defendant Liu Song is its sole director, and BVI entity Teamzone is Ocean Great's sole shareholder.  *Id.*  Liu Song is the sole shareowner of Teamzone.  *Id.*  Approach Group made a transfer of $10 million to Teamzone on or about August 14, 2009.  *Id.*  Approach Group also made two transfers of $30 million to Cido Shipping, White Bellflower's parent company on December 21, 2009 and January 7, 2010. Ayres Declaration ¶ 11, Ex. 4. These transfers are alleged to have been used by Liu Song for the purpose of the Ocean Shanghai and sister vessel Ocean Tianjin, also from CIDO Shipping.  *Id.*

In sum, it is both evident and expressly alleged that the vessel Ocean Shanghai (and single purpose entity Ocean Great) are the direct and clear "fruit" of the wrongful transfers.  Not only is such a connection more than sufficient to satisfy the requirements of *Shaffer v. Heitner*, 433 U.S. 186 (1977) (*see generally, Banco Ambrosiano v. S.A.V. Artoc Bank & Trust Limited,* 62 N.Y.2d 65-71 (1984)), but as set forth in the Ng Declaration, under BVI law this connection would be sufficient for Farenco BVI to bring an *in rem* action against the Ocean Shanghai if the vessel were berthed in the British Virgin Islands instead of New Orleans.[24]  *See Ng* Declaration ¶¶ 49-56.

---

[24] Defendants make numerous "straw man arguments," based on either intentional or unintentional mischaracterizations of Farenco BVI's claims.  Perhaps the most egregious is their multi-page discourse on the jurisdictional contacts necessary to assert *in personam* jurisdiction, and how mere visits by a vessel to a locale are insufficient to create such jurisdiction.  Farenco BVI asserts only *quasi in rem* jurisdiction as to all Defendants, and hence it is unnecessary to respond to those arguments.  Nevertheless, to put the pattern of Defendants' curious argumentation in perspective, Farenco BVI advises the Court that for the past year, Defendants have contended that

### D. Farenco BVI Welcomes a Credibility Analysis

Since the outset of the Farenco BVI Liquidation, Defendants have lied, stolen, deceived and have generally acted inequitably as to matters both big and small.  For the Court's reference, as the chronology of this multi-jurisdictional action is relevant, the various declarations submitted by the Liquidators and BVI counsel to the New York Bankruptcy Court, without their associated, voluminous exhibits, are attached as Exhibits 4, 5, 6, and 7 to the Patrick Declaration.[25]

By way of summary, Farenco BVI submits that the following acts substantially diminish Defendants' credibility (*see generally,* Patrick Declaration Ex. 7, Declaration of John Ayres dated August 17, 2012, ¶¶ 22-31):

- The attempted, surreptitious "solvent" liquidation of Approach Group, immediately after the liquidation of Farenco BVI, on the representation that it had no creditors (subsequently reversed by the BVI Court);

- Liu Song denying in writing that Farenco BVI, a company that transacted millions of dollars in business, had no books and records (subsequent disclosures revealed this to be patently untrue);

- The post-liquidation theft of $17,120.11 from  Farenco BVI's bank account, to which Liu Song had sole signatory authority;

---

voluntary registration with New York's Secretary of State is not a constitutionally sufficient ground for *in personam* jurisdiction.

Another argument that Defendants make (albeit in a footnote) is that the Liquidator of Farenco BVI is somehow illegitimate.  First, this case is properly captioned because the claims alleged are either property of the Farenco BVI estate or inure to the benefit of the Farenco BVI estate.

Second, the New York Bankruptcy Court has been notified of the routine change in liquidators ordered by the BVI Court (the Liquidator, John Ayres of PriceWaterhouseCoopers succeeded Nicholas Carter, of PriceWaterhouseCoopers upon Nicholas Carter's retirement this summer).  The relevant statute is 11 U.S.C. § 1518, entitled "Subsequent Information."  This statute, omitted from Defendants' brief, merely provides that "prompt notice" of any "change in the foreign representative's appointment."  The notice of Mr. Carter's retirement and Mr. Ayres' appointment was duly provided to the New York Bankruptcy Court on August 17, 2012.  Chapter 15 neither contemplates nor requires an affirmative "order" or "recognition" of such change, particularly for something as routine as a liquidator's retirement.  For the Court's reference, a copy of the BVI Court order appointing Mr. Ayres as Liquidator of Farenco BVI (as well as Approach Group) is attached to the Ayres Declaration as Exhibit 1.

[25] Upon the Court's request arrangements can be made to file all exhibits filed in the New York Bankruptcy Action with this Court.

- Farenco Singapore denying that Liu Song authorized the registrations of Farenco BVI, Farenco Singapore and Farenco Hong Kong with New York's secretary of state, when his signatures were on the documents;

- The impossible-to-believe and nonsensical Ocean Dalian Master's deposition testimony, in which he denied knowledge of Farenco Singapore even though Farenco Singapore is operating the vessel on a 10-year charter, was a co-assured on insurance documents maintained aboard the vessel, and was referenced in several other documents maintained aboard the Ocean Dalian;

- Farenco Singapore's explanation that the M/V Yaun Zhi Hai charter was transferred from Farenco BVI in order to ensure that performance of the charter would "continue," when subsequently obtained emails, demonstrated that Farenco Singapore's first act upon the assignment was to "manufacture" a reason to declare default and renegotiate the charter hire payments;

- The vast majority of the Declaration of Victor Yu, submitted by Defendants in the New York Bankruptcy proceeding, in which he (i) claims no connection between Farenco Singapore and Approach Group (when in it was later learned that Approach Group capitalized Farenco Singapore in the amount of $10 million), (ii) misrepresents the status of employees of Farenco Singapore, (iii) misrepresents the use of a particular email account and Defendants' access to certain subpoenaed documents; and

- The production of the highly suspect "Investment Management Agreement" nearly a _year_ after Liu Song reported that there were "no books and records" of Farenco BVI, only _after_ significant motion practice, _after_ significant on-the-record as well as "without-prejudice" communications, and only _after_ being confronted with the detailed results of the third-party and intermediary bank discovery (including the fraudulent Approach Group transfers).

## POINT III:  SUBSITUTE SECURITY MUST BE EQUAL TO THE VESSEL'S VALUE

Defendants wrongfully presume they are entitled to merely post a sum equal to their alleged equity, without any citation or authority to support this position.  Their novel argument flies in the face of uniform precedent concerning posting of substitute security in vessel attachment and arrest actions, as well as the clear language of the statute which authorizes such substitute security to be posted.  Defendants further ignore that there is only one claimant in this action, and as such discussion of priorities is premature as the security interest of China Merchants bank has not been asserted is subject to challenge by Plaintiff on a number of grounds.

Even if the argument that substitute security is determined by the amount of alleged equity in the vessel was to be accepted, Defendants rely on an artificially deflated valuation for the vessel of approximately $16.75 million.  Farenco BVI has obtained an appraisal from Compass, a reputable

United States-based appraiser that is routinely provides vessel valuations and due appraisals and has been charged with auctioning vessels attached or arrested in the United States.  Patrick Declaration Exhibit 2.  According to the Compass Appraisal, the Vessel is appraised at between $19-$20 million. *Id.*  Based on a $19-$20 million value, and assuming Defendants' allegations concerning outstanding debt are true, Defendants' equity in the vessel increases to between $3 and $4 million.

Pursuant to Rule E(5) of the Supplemental Rules for Admiralty and Maritime Claims, release of an arrested/attached vessel may be effected upon posting of a special bond to cover "the amount of the plaintiff's claim fairly stated with accrued interest and costs."  Rule E(5)(a) provides two avenues to effect such a release.  First, the "parties may stipulate the amount and nature of such security."  Second, "[i]n the event of the inability or refusal of the parties so to stipulate the court shall fix the principal sum of the bond or stipulation at an amount sufficient **to cover the amount of the plaintiff's claim** fairly stated with accrued interest and costs; but the principal sum shall in no event exceed (i) twice the amount of the plaintiff's claim or (ii) **the value of the property** on due appraisement, whichever is smaller." Rule E(5)(a) (emphasis supplied). There is no exemption or exception which allows a bond to be posted for the "value of the property," subtracting any mortgage or security interest, particularly one that is not proven by the entity holding the mortgage interest.

Indeed, nearly every vessel in navigation is at one time encumbered by a security interest or mortgage, and it is highly significant that precedent uniformly sets the value of the substitute security at the vessel's total value when the claim is equal to or higher than the Vessel value.[26]

---

[26] *See, e.g., Crescent Towing & Salvage Co., Inc. v. Chios Beauty MV*, 610 F.3d 263 (5th Cir. 2010)(applying Rule E(5)); *Torch Offshore, LLC v. M/V Midnight Summer*, No. 03-343, 2003 WL 21181467, *2(E.D.La May 19, 2003); *Feret Marine Supply v. M/V Enchanted Capri*, No. CIV. A. 00–3805, CIV. A. 00–3809, CIV. A. 01–70, CIV. A. 01–71, CIV. A. 01–87, 2001 WL 649764, *3 (E.D.La June 11, 2001); *Satra Metallurgical*, No. 93-0457, 1994 WL 577433, *2 (W.D.Wash Feb. 14, 1994)(further holding as follows: "at the hearing to consider its motion, defendant requested, in the event its motion was denied, that it be allowed to post a bond and have its vessel released. Supplemental Rule E(5)(a) authorizes the Court to set a bond in the event the parties are unable or refuse to stipulate

Even more significantly, Defendants' mortgage argument is simply not appropriate to make at this stage.  The alleged ship "mortgage" appears to actually be a  non-purchase money revolving line of credit that happens to be secured, *inter alia* by the Ocean Shanghai along with other assets.  This security interest been not asserted by China Merchants bank, nor has China Merchants Bank tried to assert any mortgage priority.

China Merchants Bank is and has been the primary financial institution and lender for Defendants, as well as the other Liu Song owned and controlled entities that serve as vessel owning and holding vehicles for the other "Ocean" vessels he purchased using wrongfully transferred Farenco BVI funds.  See V. Compl. at ¶ 55; Ayres Declaration ¶ 12.  As Defendants are keenly aware, the relationship between Defendants and China Merchants Bank will be carefully scrutinized in this action.  As stated above, while this analysis is premature at this stage, certain points must be noted in light of Defendants' arguments.

It is believed that China Merchants Banks conducted extensive due diligence and would have required cash holdings and collateral within the vessel owning and holding companies.  This explains the "capitalization" of Defendants Farenco Singapore (a guarantor on the loan) and Defendant Teamzone (single-purpose holding company for single purpose vessel-owning entity, Defendant Ocean Great), by Approach Group, with approximately $10 million of wrongfully transferred Farenco BVI funds.  See V. Compl. at ¶ 60.  The logical inference from China Merchants Bank's long and significant relationship with the Liu Song entities is that China Merchants Bank knew of, acquiesced to and facilitated the alleged fraud.

---

to the amount and nature of the security to be posted in order to have property released from an attachment. The rule limits the principal sum of the bond to no more than twice the value of plaintiff's claim or the value of the property on due appraisement, whichever is smaller. In this case, plaintiff is seeking damages in excess of $7,000,000. Defendant submitted an appraisement, which valued the attached vessel at $2,050,000. Plaintiff's have no objection to this assessment. The Court thus sets bond for release of the M/V STORMY ANNIE at $2,050,000.")

These facts are highly significant under both United States and British Virgin Islands law. China Merchants Bank will be well aware of these issues as well.  In the event that the underlying loan agreement is breached China Merchants may simply decide not to appear in this action, and instead enforce against other pledged collateral or Defendant Liu Song *in personam*.  In the event that China Merchants Bank takes the calculated risk of asserting their security interest in this action, that interest will be subject to, at a minimum, the following defenses and investigations.

First, as set forth in the Ng Declaration, upon a showing that China Merchants Bank had knowledge or constructive knowledge of the fraud at issue, its security interest would be subject to Farenco BVI's constructive trust upon the Ocean Great, which arose prior to China Merchants Bank's security interest.

Second, priority of the foreign mortgage is subject to the defense of equitable subordination. *Custom Fuel Services, Inc. v. Lombas Industries, Inc.*, 805 F.2d 561, 565 (5th Cir. 1986).  Originally developed in bankruptcy law, the doctrine of equitable subordination is used to avoid the inequity of a claim brought against a bankruptcy estate that would produce unfair results. It allows for subordination of claims when the claimant has engaged in some type of "inequitable conduct" which has conferred an unfair advantage on the claimant or resulted in injury to creditors. *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977).

The three conditions necessary to justify equitable subordination in the context of a ship mortgage are "(i) the claimant must have engaged in some type of inequitable conduct. (ii) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant. (iii) equitable subordination of the claim must not be inconsistent with [statutory provisions]." *Custom Fuel Services, Inc.*, 805 F.2d at 566 (citations omitted).   Under the circumstances, these elements appear to be satisfied in this case, based only on the discovery already obtained.

Third, to the extent that China Merchants Bank maintains a security interest in cash collateral of Defendants (or parties related to Defendants) to enforce the loan at issue, this Court can order China Merchants Bank to first look to its other security pursuant to the equitable doctrine of marshalling.

The doctrine of marshalling "rests upon the principle that a creditor having two funds to satisfy his debt, may not by his application of them to his demand, defeat another creditor who may resort to only one of the funds. *Meyer v. United States,* 375 U.S. 233 (1963) ("[Marshaling] is founded… in equity, being designed to promote fair dealing and justice.  Its purpose is to prevent the arbitrary action of a senior lienor from destroying the rights of junior lienor or creditor having less security").

Thus, the marshaling doctrine requires that a senior lienholder, such as a bank providing a purchase money mortgage (assuming *arguendo* that its mortgage lien is a maritime lien and is valid, has priority, is not primed, and should not be equitably subordinated) resort first to assets unavailable to the junior lienholder to prevent the "inequity which would otherwise result from the unnecessary elimination of the junior lienholder's security with the increased likelihood the junior creditor would be unable to satisfy its claim." It is long established that the equitable doctrine of marshalling applies in admiralty actions such as this.  *See, e.g., Moore-McCormack Lines, Inc. v. Richardson,* 295 F.2d 583 (2d Cir. 1961).

Respectfully submitted,

*/s/Patrick H. Patrick*
Laurence R. DeBuys IV (14202)
Patrick H. Patrick, T.A.  (14297)
Stephen E. Mattesky (09046)
Patrick Miller LLC
400 Poydras Street, Suite 1680
New Orleans, Louisiana   70130
Telephone:  (504) 527-5400
Facsimile:   (504) 527-5456
E-mail: ppatrick@patrickmillerlaw.com

Of counsel

_____

James H. Power
Warren E. Gluck
Holland & Knight LLP
31 West 52nd Street
New York, NY 10019
Telephone: (212) 513-3200
Facsimile: (212) 513-9010
E-mail: james.power@hklaw.com
E-mail: warren.gluck@hklaw.com
*pro hac vice pending*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been served

on all counsel of record by placing a copy of same in the United States mail, postage prepaid and

properly addressed, this 6th day of November, 2012 and/or by notification via e-filing.

*s/ Patrick H. Patrick*
PATRICK H. PATRICK